UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Carlo Adams,                    Case No. 3:14-cv-01526

        Plaintiffs

    v.                                 AMENDED MEMORANDUM
                                        OPINION & ORDER

Ohio Dept. of Developmental Disabilities, et al.,

        Defendants

## I.      INTRODUCTION

Plaintiff Carlo Adams filed suit against Defendants the Ohio Department of Developmental Disabilities (the "ODDD"), Ginnie Whisman, and Sara Lawson, alleging they violated his rights under federal and state law. Defendants filed a motion for judgment on the pleadings. (Doc. No. 6). Adams filed a brief in opposition to the motion and asked, in the alternative, for leave to file an amended complaint. (Doc. No. 13). Adams mistakenly omitted his proposed amended complaint from his opposition brief, but submitted it subsequently. (Doc. No. 18). Defendants filed a brief in reply to Adams's opposition brief, and also filed a brief in opposition to Adams's motion to amend. (Doc. No. 17, Doc. No. 21). For the reasons stated below, Defendants' motion to dismiss is granted in part and denied in part, and Adams's motion to amend his complaint is granted in part and denied in part.

## II.      STANDARD

Rule 12(c) motions for judgment on the pleadings are subject to the same standard as a Rule 12(b)(6) motion to dismiss. *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007). A court construes the complaint in the light most favorable to the plaintiff and accepts as true well-

pleaded factual allegations. *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 896 (6th Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Factual allegations must be sufficient to state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. Legal conclusions and unwarranted factual inferences are not entitled to a presumption of truth. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In ruling on a motion to dismiss, a court may consider public records as well as documents attached to the motion to dismiss if those documents "are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999), abrogated on other grounds by *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

If a party seeks to amend its pleading more than 21 days after service of a responsive pleading, the party must obtain "the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(1)-(2). Leave should be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). "In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1123 (6th Cir. 1989).

### III.  BACKGROUND

Adams was employed by the ODDD, primarily as a Therapeutic Program Worker, at the Tiffin Developmental Center from August 26, 2002 until August 15, 2013. The Tiffin Developmental Center "provides housing and related services to over 100 residents with severe disabilities." (Doc. No. 18-1 at 3). Throughout his employment, some residents of the Tiffin Developmental Center regularly directed racial slurs and other racially-charged comments at Adams, who is African-American. Adams asserts he regularly complained about this comments to Lawson, who was the Superintendent at the Tiffin Developmental Center, but Lawson did not address his complaints or separate him from these residents.

2

At various times, the Tiffin Developmental Center created Temporary Work Level ("TWL") positions to fulfill certain job duties while the employee who normally performed those duties was on leave. Around January 2013, Adams sought, but did not receive, a TWL Resident Care Supervisor position. Adams asserts he was not considered for this position, even though he was the most qualified person; Adams previously held a TWL Resident Care Supervisor position between April 2010 and November 2010, had worked at Tiffin Developmental Center for over 10 years, and had a bachelor's degree in business administration. (Doc. No. 21-1). Instead, a Caucasian employee, who Adams asserts was less-experienced and less-qualified, was promoted after the position was offered to another African-American employee who "Defendants knew would turn down the . . . position." (Doc. No. 18-1 at 5). Adams contends Defendants also failed to follow Department policies when they listed the position as unclassified instead of classified. Adams expressed his concerns to Whisman, a deputy director with the ODDD, who responded Adams's concerns about the classification were unwarranted and that he should talk to Lawson about the reasons he was not chosen for the temporary position. On January 14, 2013, Adams filed a joint charge of racial discrimination regarding the TWL Resident Care Supervisor position with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC"). (Doc. No. 21-1).

Adams continued to work at the Tiffin Developmental Center after filing his charge of discrimination. On May 26, 2013, Adams and another employee went in search of a Tiffin Developmental Center resident who had "eloped" from the Center. They located the resident on a nearby highway, but the resident attempted to flee when he saw Adams and the other employee. The resident tripped and fell during this attempt, allowing Adams and his coworker to catch up to and secure the resident. A third coworker arrived to help return the resident to the Center. After the resident returned to the Tiffin Development Center, employees discovered the resident had several broken ribs. When asked about the injury, the resident said "two 'niggers' had kicked him

while he was on the ground" – referring to Adams and the third coworker who assisted in returning the resident to the Center. (Doc. No. 18-1 at 6). Adams asserts the resident had a history of making false allegations and racially-charged statements against and to Tiffin Developmental Center Employees, and that Defendants were aware of this history. While Adams denied kicking the resident and the resident subsequently admitted Adams did not kick him, Defendants terminated Adams for "Abuse of a Client." (Doc. No. 18-1 at 6).

Adams alleges Defendants in fact terminated him because of his race and in retaliation for the charge of discrimination he filed with the OCRC. After he was terminated, Adams hired an attorney. Adams's attorney sent Defendants a letter notifying them of Adams's claims on December 9, 2013. Several months later, on April 24, 2014, the ODDD "sent Adams a letter in which it threatened to have Adams[']s] name placed on the 'registry of [ODDD] employees found to have committed specified misconduct regarding an individual with developmental disabilities[.']" (Doc. No. 18-1 at 7). Adams contends this letter was designed to intimidate him and constitutes further retaliation.

### IV.   ANALYSIS

Adams seeks leave to file an amended complaint. His proposed amended complaint would remove some claims, amend others, and add one additional claim. As I set out in greater detail below, I grant Adams leave to amend his complaint with respect to Count I,[1] deny his request for leave with respect to Counts II and III as futile, deny his request for leave with respect to Counts IV and VI because he failed to exhaust his administrative remedies, and deny his request with respect to Count V as moot. Defendants' motion for judgment on the pleadings therefore is denied as to Count I, granted with respect to Counts II, III, IV, and VI, and denied as moot with respect to Count V.

---

[1] Unless otherwise noted, all references to a "count" refer to the proposed amended complaint, rather than the original complaint.

4

### A. COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Adams's original and proposed amended complaints include a claim for the intentional infliction of emotional distress. (Doc. No. 18-1 at 9-10 (Count V)). Adams "intended" to file the proposed amended complaint "contemporaneously with the filing of [his] Brief in Opposition . . . [but did not file it] due to a clerical error." (Doc. No. 18). Because Adams's mistake was inadvertent, I requested he file the proposed amended complaint to ensure his claims were fully considered. Shortly after Adams's filing of his opposition brief and inadvertent omission of his proposed amended complaint, Adams filed a stipulated notice of dismissal without prejudice of his intentional-infliction-of-emotional-distress claim. (Doc. No. 15). I conclude Adams's belated filing of his proposed amended complaint operates only to remedy the inadvertent omission of that document from his motion to amend his complaint, and does not seek to revoke the stipulated notice of dismissal, or seek reconsideration of my order granting dismissal of that claim. (*See* Doc. No. 13 at 12; Doc. No. 16; Doc. No. 18). Therefore, I confirm my February 17, 2015 order dismissing without prejudice Count V, Adams's intentional-infliction-of-emotional-distress claim, against all Defendants.

### B. WHISMAN AND LAWSON ARE NOT EMPLOYERS UNDER TITLE VII

In both his original and amended complaints, Adams names Whisman and Lawson as defendants. While supervisors may be individually liable for violations of Ohio Revised Code Chapter 4112, "[a]n individual cannot be held personally liable for violations of Title VII." *Griffin v. Finkbeiner*, 689 F.3d 584, 600 (6th Cir. 2012) (citing *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997)). Contrary to Adams's assertion, *Mengelkamp v. Lake Metro. Hous. Auth.*, 549 F. App'x 323, 334-35 (6th Cir. 2013), did not – and could not – abrogate the *Wathen* and *Griffin* holdings. *See* 6 Cir. R. 32.1(b) ("Published panel opinions are binding on later panels. A published opinion is overruled only by the court en banc.") Adams has dismissed without prejudice all of his state-law claims.

5

(Doc. No. 14; Doc. No. 16).  Therefore, there are no remaining claims under which Whisman and Lawson may be held individually liable, and I dismiss them from this action.

### C. COUNT I – FAILURE TO PROMOTE

Adams proposes to amend Count I of his complaint to remove references to a hostile work environment.  Count I therefore would state only a claim that the ODDD's refusal to consider him for the promotion was the result of impermissible racial discrimination.  (Doc. No. 18-1 at 7-8).  Adams alleges a less-qualified Caucasian employee was chosen for the TWL Resident Care Supervisor position instead of Adams because of Adams's race.  Adams properly exhausted this claim by filing a complaint with the OCRC[2] and states a plausible claim of race discrimination.

The ODDD argues Adams fails to state a claim for relief because (1) he previously was promoted to a TWL Resident Care Supervisor position; (2) an African-American was offered the position before the Caucasian employee was promoted; and (3) Adams's claim that the ODDD first offered the job to an African-American employee it knew would turn down the position "is not a fact but mere speculation . . . ."  (Doc. No. 21 at 10-11).  The ODDD's arguments are not persuasive.

First, the fact that Adams previously held a TWL Resident Care Supervisor position does not mean the ODDD's refusal to consider him for this position could not have been motivated by his race.  Past nondiscriminatory conduct does not eliminate any future claim of discrimination.  Adams held the temporary position in 2010, and states in his OCRC charge that ODDD policies regarding open positions had not been followed since January 2012 and that Lawson had "handpicked" individuals who "seem to fall within a certain demographic guideline" to fill open positions.  (Doc. No. 21-1 at 2).

Second, the promotion offer made to another African-American employee does not prevent Adams from stating a plausible claim for relief.  Adams alleges not only that he was not promoted

---

[2]  The OCRC is a certified designated Fair Employment Practice agency.  29 C.F.R. § 1601.80.  The EEOC accepts the findings and resolutions of the OCRC as final.  29 C.F.R. § 1601.77.

6

because of his race, but also that he was not even considered for the position because of his race. Where, as here, an employer "does not provide a formal mechanism for expressing interest in the promotion . . . the [employer] is held to a duty to consider all those who might reasonably be interested in a promotion . . . ." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1022 (6th Cir. 2000).

*Hall v. Michigan State Police Dep't*, 290 F. App'x 913 (6th Cir. 2008), does not alter this analysis. In *Hall*, the defendant held two rounds of interviews for a formally-posted position. *Id.* at 915. Following the first round of interviews, an African-American candidate was offered the position after she received the highest number of points on a procedure the defendant used for making promotion decisions. *Id.* After that candidate turned down the promotion, the defendant decided to hold a second round of interviews because the four remaining candidates received identical scores. After Hall removed himself from consideration, the now-three remaining candidates were interviewed a second time, and a Caucasian was offered and accepted the promotion. *Id.* at 916. The *Hall* court, in reviewing the district court's summary judgment decision, concluded Hall did not establish a prima facie case of race discrimination with regard to the first round of interviews because a member of the same protected class received the promotion offer, or with regard to the second round of interviews because Hall in essence revoked his application for the promotion. *Id.* at 917-18.

Unlike the defendant in *Hall,* the ODDD did not utilize a formal interview process, or hold multiple rounds of interviews. To the extent the elements of a *McDonnell Douglas* prima facie case may be relevant at the pleading stage, the fourth prong – i.e., "other employees of similar [or lesser] qualifications who were not members of the protected class <u>received</u> promotions" – plainly is satisfied here. *Hall*, 290 F. App'x at 917 (quoting *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003)) (alteration and emphasis added).

Finally, and relatedly, Adams's allegation that the promotion offer was made to another African-American employee because Defendants knew that employee would turn down the position,

7

and Defendants could then offer the position to the Caucasian employee, is presumed to be true. *Iqbal*, 556 U.S. at 679. It is inappropriate to disregard this principle when the only reason to disbelieve a plaintiff's factual allegation regarding a defendant's conduct is the defendant's protestation that the allegation is untrue. Count I states a plausible claim for relief, and Adams's motion for leave to amend is granted as to this count.

### D. COUNT II – WRONGFUL TERMINATION

Adams alleges the ODDD terminated him because of his race. The ODDD argues this claim should be dismissed because Adams did not exhaust his administrative remedies regarding this claim. I conclude Adams is not precluded from bringing this claim by his failure to include it in his administrative charge but deny his motion to amend this count because he fails to state a plausible claim for relief.

Plaintiffs who bring suit under Title VII first must exhaust their administrative remedies by filing a charge of discrimination. *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004). Exhaustion is determined by "the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 380 (6th Cir. 2002). The purpose of the exhaustion requirement "is to trigger an investigation, which gives notice to the alleged wrongdoer of its potential liability and enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation." *Dixon*, 392 F.3d at 217 (citing *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998)). The Sixth Circuit uses the "expected scope of investigation test," under which a plaintiff is not precluded from bringing suit on an uncharged claim if the facts alleged as the basis for the charged claim would prompt the EEOC to investigate the uncharged claim. *Dixon*, 392 F.3d at 217.

The primary instance in which an uncharged claim is deemed to be exhausted under the expected-scope-of-investigation test is when the uncharged claim alleges retaliation for filing the charged claim. *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 833 (6th Cir. 1999); *Abeita v.*

8

*TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998). Thus, as the ODDD implicitly concedes, when an employee is terminated after filing an administrative charge, it is reasonable to expect that the OCRC or the EEOC would investigate whether the termination was motivated by retaliation. (*See* Doc. No. 21 at 11-13).

While the ODDD does not dispute whether Adams should be considered to have exhausted his claim that his termination was in retaliation for filing his OCRC charge, it does assert Adams's separate claim of "alleged race discrimination relating to his termination cannot reasonably be expected to grow out of the charge he filed under the circumstances here . . . ." (Doc. No. 21 at 8). I disagree. If it is expected that the OCRC would investigate Adams's termination to determine whether it was in retaliation for filing a charge, it is reasonable to assume the OCRC also would investigate other potential discriminatory reasons for that termination. At the very least, the OCRC would ask the ODDD why Adams was fired. *Weigel*, 302 F.3d at 380 ("[T]he employer's articulation of its nondiscriminatory reasons for taking a challenged adverse employment action is an essential step in any discrimination investigation."). The OCRC would not simply take the ODDD at its word; it would ask Adams if he disputed the ODDD's reasons. Adams plainly does, and the ODDD offers no reason to think Adams would not have told the OCRC why. Even if the OCRC limited its investigation to only inquiring whether Adams's termination was in retaliation for filing his OCRC charge, it is not a reason to preclude Adams from bringing suit. *Crowder v. Railcrew Xpress*, 557 F. App'x 487, 492 (6th Cir. 2014) ("A plaintiff is not penalized for the EEOC's failure to conduct a broader investigation.") (citing *Scott v. Eastman Chem.*, 275 F. App'x 466, 471 (6th Cir. 2008)).

Adams's complaint, however, does not contain sufficient factual allegations to permit the plausible inference that he was terminated because of his race. He pleads only "Defendants' purported justification for terminating Adams was pretext for unlawful race discrimination." (Doc. No. 18-1 at 7). The eloped resident's history of false allegations and racially-charged comments do

not support a plausible inference that the ODDD's actions were motivated by racial discrimination, because the reasons to disbelieve the eloped resident's story – his unreliability – are not related to what Adams must prove. In order to show the ODDD discriminated against him on the basis of his race, Adams must show direct evidence or disparate treatment. He does not allege either. Instead, he alleges the ODDD seized on the eloped resident's story as an easy (but false) reason to terminate him. Adams's predicate allegation – that the ODDD terminated him because he is black – is a conclusory allegation that is not entitled to a presumption of truth. Adams's motion to amend is denied, and the ODDD's motion to dismiss is granted, as to this count.

### E. COUNT III – RETALIATORY TERMINATION

Adams alleges his termination was retaliatory because he "regularly opposed unlawful racial discrimination at ODDD." (Doc. No. 18-1 at 8). He also alleges his termination was retaliatory because he "filed a complaint with the OCRC" and "opposed race discrimination by reporting the racially[-]charged remarks of [Tiffin Developmental Center] residents and requesting to be separated from them." (Doc. No. 18-1 at 7). I deny Adams's request for leave to amend and dismiss this claim because Adams fails to state a plausible claim for relief.

Nearly five months passed between the date on which Adams filed his OCRC complaint and the date on which the eloped resident accused Adams of kicking him, while seven months passed between Adams's filing of the OCRC complaint and his termination. The Sixth Circuit has held the passage of four months between the filing of a discrimination claim and termination is "insufficient to support an [inference] of retaliation." *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986). While a plaintiff may establish an inference of retaliation by combining a temporal proximity of more than four months with other evidence of retaliation, Adams does not allege any facts which would connect his OCRC charge to the ODDD's investigation of the eloped resident's allegations. *See Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008). Adams argues "Defendants quickly jumped on the first opportunity they could to justify terminating [him,]" but this does no

more than rely on temporal proximity. (Doc. No. 13 at 10). Adams fails to plausibly allege a causal connection between his OCRC charge and his termination. *See Univ. of Texas S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2532-33 (2013).

Separately, the ODDD is entitled to judgment on the pleadings regarding Adams's claim he was terminated in retaliation for opposing racial discrimination because Adams did not exhaust that claim. Adams's OCRC charge does not mention racially-charged comments by residents, or the Tiffin Developmental Center's refusal to address those comments. It is not reasonable to expect the OCRC investigation of Adams's specific failure-to-promote allegations to lead to an investigation of resident behavior at the Tiffin Developmental Center. *Dixon*, 392 F.3d at 217. The most recent date on which Adams alleges he opposed unlawful discrimination is January 12, 2013, when he filed his OCRC charge, and I already have concluded he fails to allege a causal connection between that event and his termination.

### F. COUNT IV – POST-EMPLOYMENT RETALIATION

Adams asserts the ODDD retaliated against him when it threatened to have his name placed on a patient-abuse registry "based upon Adams' opposing racial discrimination at ODDD by exercising his rights under Title VII . . . by obtaining legal counsel to pursue wrongful termination claims against Defendants." (Doc. No. 18-1 at 9). Adams alleges the ODDD threatened to place his name on this registry on April 24, 2014. (Doc. No. 18-1 at 7). Unlike Adams's retaliatory termination claim, it is not reasonable to expect this claim to fall within the scope of the OCRC's investigation. Even if the ODDD's alleged retaliation against Adams for hiring an attorney conceivably could be connected to the filing of his OCRC charge, the alleged conduct occurred too late to be included in the OCRC investigation. *See Scott*, 275 F. App'x at 474. Adams did not hire an attorney, and Adams's attorney did not contact the ODDD, until after the OCRC closed its investigation. (Doc. No. 18-1 at 2, 7). I conclude Adams failed to exhaust his administrative remedies as to this claim and grant the ODDD's motion to dismiss.

11

G. **COUNT VI – HOSTILE WORK ENVIRONMENT**

Adams alleges "Defendants permitted and encouraged [Tiffin Developmental Center] patients to openly harass Adams on the basis of his race by failing to address Adams['s] complaints and requiring him to continue working with patients who regularly called him a 'nigger.'"  (Doc. No. 18-1 at 10).  Adams alleges these incidents occurred before he filed his charge with the OCRC, but he did not include them in that charge.  Moreover, Adams does not explain how the residents' racist comments or his supervisors' failure to address those comments is related to his failure-to-promote claim.  The OCRC charge contains no reference to resident behavior and it is not reasonable to expect that the OCRC would have investigated this conduct.  *See Ross v. ITT Cleveland Motion Control*, 2010 WL 779999, at *5 (N.D. Ohio, March 2, 2010) ("[T]he Court can find no case law that would allow a plaintiff to raise a claim in a Title VII action that is unrelated to and precedes the conduct alleged in the administrative charge.").  I conclude Adams failed to exhaust his hostile-work-environment claim and grant the ODDD's motion to dismiss that claim.

V. **CONCLUSION**

For the reasons stated above, I grant Adams leave to amend his complaint with respect to Count I, deny his request for leave with respect to Counts II and III as futile, deny his request for leave with respect to Counts IV and VI because he failed to exhaust his administrative remedies, and deny his request with respect to Count V as moot.  Defendants' motion for judgment on the pleadings is denied as to Count I; granted with respect to Counts II, III, IV, and VI; and denied as moot with respect to Count V.  Defendants' motion also is granted with respect to all claims against Whisman and Lawson.  Adams may proceed with his race discrimination claim (Count I) against the ODDD only.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge